**RABINOVICH SOKOLOV LAW GROUP LLC**　　*Attorneys for Plaintiff*
Oleg Sokolov, Esquire
Identification No. 320186
Jason Rabinovich, Esquire
Identification No. 308167
1700 Market Street, Suite 1005
Philadelphia, PA 19103
Tel: (215) 717-2200
E-mail: oleg@rslawgroup.com

### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CHECKOUT LLC,<br><br>　　　　*Plaintiff*,<br><br>　　v.<br><br>HERRERA INSURANCE MARKETING LLC, LAURO VARGAS HERRERA, MILLENNIAL LIBERATOR LLC, and ORLANDO MAYORGA<br><br>　　　　*Defendants*. | Civil Action No. |

### COMPLAINT

Plaintiff, Checkout LLC d/b/a ADs Checkout (hereinafter, "ADs Checkout"), by and through its undersigned counsel, hereby brings this civil action against Defendants, Herrera Insurance Marketing LLC, Lauro Vargas Herrera, Millennial Liberator LLC, and Orlando Mayorga (collectively, "Defendants"), and, in support thereof, respectfully avers as follows:

### THE PARTIES

1.　　Plaintiff, Checkout LLC d/b/a ADs Checkout is a Pennsylvania Limited Liability Company with a registered office at 820 Fox Chase Rd., 2nd Floor, Rockledge, PA 19046.

2. ADs Checkout is an insurance lead business that sells insurance leads to various insurance brokers.

3. ADs Checkout is collectively owned by Hryhory Yakymiv ("Gregory") and Michael Yakymiv ("Michael").

4. Defendant, Herrera Insurance Marketing LLC ("Herrera Insurance") is a California Limited Liability Company with a registered office at 9550 Mendenhall Ave., Upper Lake, CA 95485.

5. Defendant, Lauro Vargas Herrera ("Herrera") is an adult individual with an address at 9550 Mendenhall Ave., Upper Lake, CA 95485.

6. Upon information and belief, Herrera is an owner of Herrera Insurance and is an insurance agent licensed in the State of California, License ID#: 0E15391.

7. Defendant, Millennial Liberator LLC ("Milllennial Liberator") is an unregistered entity without a registered business address.

8. Herrera Insurance and Millennial Liberator are insurance marketing agencies that purchase insurance leads from data technology companies and sells the insurance lads to insurance lead to other businesses.

9. Defendant, Orlando Mayorga ("Mayorga") is an adult individual with an address at 1695 Judith Dr., Kissimmee, FL 34758.

10. Upon information and belief, Mayorga is an owner of Millennial Liberator and an associate of Herrera.

## JURISDICTION AND VENUE

11. The Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1), as this action is between citizens of different States and the amount in controversy exceeds $75,000.00.

12. The Court has personal jurisdiction over the Defendants Herrera Insurance, Herrera, Millennial Liberator, and Mayorga (collectively, "Defendants"), as the Defendants regularly conduct business in this jurisdiction—including the actions which gave rise to this lawsuit.

13. Venue is proper in this District pursuant to 18 U.S.C. § 1965(a) as Defendants transact business in this District, and a substantial portion of ADs Checkout's claim arose in this District.

## FACTUAL BACKGROUND

14. At all material times hereto, Herrera Insurance and Millennial Liberator vended insurance leads from X-Telecom ("X-Telecom") and Benchmark Services Private Limited ("Benchmark Services"), insurance lead vendors incorporated in Pakistan, and sold the leads to various insurance lead businesses.

15. At all material times hereto, Mayorga worked in concert with Herrera in vending insurance leads to ADs Checkout.

16. On or about April 27, 2021, Michael purchased white label training videos from Herrera for $3,000.00. A true and correct copy of the invoice for the white label training videos is attached hereto as Exhibit "A".

17. In addition to paying Herrera $3,000 for the white label training videos, Mayorga requested that Michael enter into a Non-Disclosure Agreement (the "NDA") with Millennial

Liberator to prevent Michael from disclosing the content of the training videos. A true and correct copy of the NDA is attached hereto as Exhibit "B".

18. Michael was under the age of 18 when he signed the NDA on or about April 27, 2021.

19. After Michael executed the NDA with Millennial Liberator, ADs Checkout began purchasing live transfer insurance leads from X-Telecom through Herrera.

20. Upon information and belief, Herrera, on behalf of Herrera Insurance, requested that ADs Checkout prepay X-Telecom a month in advance for any leads that ADs Checkout purchases from X-Telecom and Benchmark Services.

21. ADs Checkout would make prepayments to X-Telecom and Benchmark services by paying money to Herrera's personal bank accounts under the impression that Herrera Insurance would remit the money to X-Telecom and Benchmark Services.

22. Herrera guaranteed to ADs Checkout that ADs Checkout and its customers would receive a twenty percent (20.00%) conversion of insurance leads to sales.

### ADs Checkout Provides a Loan to Herrera

23. On or about September 21, 2021, ADs Checkout provided Herrera with a loan in the amount of $7,000.00 (the "Loan") for Herrera to open up a call center in Colombia for X-Telecom, for which Herrera promised to repay by November 10, 2021. *See* Correspondence regarding the Loan between Michael and Herrera attached hereto as Exhibit "C".

24. Upon information and belief, Herrera and X-Telecom used the $7,000.00 to fund their Medicare Insurance campaigns.

25. On or about November 10, 2021, Michael demanded that Herrera repay the Loan in the amount of $7,000.00 to ADs Checkout and Herrera requested that Michael provided him with an extension to repay the Loan. *See* Ex. C.

26. To date, Herrera has failed to repay the $7,000.00 Loan to ADs Checkout and has endlessly provided excuses as to why he cannot repay the Loan.

### Herrera's Failure to Pay X-Telecom and Benchmark Services

27. Beginning in the end of September 2021, ADs Checkout made several payments to Herrera's personal bank accounts for Herrera Insurance to remit to X-Telecom. True and correct copies of the invoices from X-Telecom are attached hereto as Exhibit "D".

28. After ADs Checkout made the payments to Herrera, it did not receive approximately 501 insurance leads that it paid for during the month of October 2021.

29. ADs Checkout prepaid $6,636.00 to Herrera for the leads that X-Telecom did not deliver to Herrera.

30. ADs Checkout only received lead volume from Benchmark Services since the end of September 2021.

31. On or about October 19, 2021, Benchmark Services contacted Michael directly and informed him that it did not receive payments from ADs Checkout account.

32. On the same day, Benchmark Services informed Michael that Herrera failed to pay Benchmark Services an outstanding balance of $18,308.00 on behalf of ADs Checkout.

33. Additionally, ADs Checkout paid $1,915.00 to Herrera for callbacks that ADs Checkout received and ADS Checkout intended for Herrera to remit that money to Benchmark Services.

34. As further proof that Herrera has been delinquent with payments to Benchmark Services, Benchmark Services notified Michael that Herrera owes Benchmark Services a balance of $2,700.00 for an unrelated project.

35. As a further result of Herrera's failure to pay Benchmark Services, Benchmark Services was forced to terminate several of its staff members.

36. Upon information and belief, Herrera misrepresented to ADs Checkout that Benchmark Services' lead volume has doubled in October 2021 although Benchmark Services suffered from decreasing lead volume.

37. ADs Checkout paid $13,781.00 out-of-pocket directly to Benchmark Services towards the outstanding balance that Herrera owes Benchmark Services on behalf of ADs Checkout.

38. Additionally, Herrera represented to ADs Checkout that the Benchmark Services' call center experienced issues with callbacks and ADs Checkout compensated Benchmark Services in the amount of $1,915.00 for the callbacks.

39. Upon information and belief, a callback is an undelivered call to a call center when a call center experiences a high volume of calls.

40. Herrera misrepresented to ADs Checkout that Benchmark Services' call center experienced issues and never remitted the $1,915.00, instead keeping the money for himself.

41. On or about November 10, 2021, Michael confronted Herrera about his failure to pay Benchmark Services on behalf of ADs Checkout and Herrera angrily blamed Benchmark Services and its internal accounting.

42. Herrera further stated that the outstanding balances owed to Benchmark Services are unrelated to the invoices that Herrera provided to ADs Checkout.

43. Since October 28, 2021, X-Telecom did not deliver any insurance leads directly to ADs Checkout, causing AD Checkout's customers to demand refunds and terminate business relations with ADs Checkout.

44. Prior to October 28, 2021, ADs Checkout received a minute amount of insurance leads that it paid for.

45. Upon information and belief, Herrera failed to pay X-Telecom on behalf of AD Checkout's for insurance leads.

46. Additionally, due to Herrera's failure to deliver insurance leads to ADs Checkout, ADs Checkout was forced to compensate its customers for the guaranteed 20.00% conversion of insurance leads that Herrera promised ADs Checkout and its customers.

47. It was during this time that Michael informed Herrera that the lack of insurance lead volume was detrimental to AD Checkout's business and it significantly impacted AD Checkout's cash flows.

48. As a result, Herrera demanded that he take over AD Checkout's distribution platform which AD Checkout did not place for sale.

49. On or about November 10, 2021, Michael confronted Herrera about his failure to remit the payments that he received from ADs Checkout to Benchmark Services.

50. In response, Herrera suggested that Michael was victimizing Herrera and that Michael tried to hurt Herrera Insurance's business by speaking to Benchmark Service's employees.

51. Herrera further responded by stating to Michael that a cease-and-desist letter from Herrera's personal lawyer threatening to hold Michael accountable would be forthcoming.

52. Further, beginning on or about June 1, 2021, Herrera discussed ADs Checkout's business on his Youtube channel and used ADs Checkout's name to promote leads to insurance agents and collect payment on behalf of ADs checkout.

53. At all material times hereto, ADs Checkout never hired Herrera as an employee or representative of its company.

54. As of the date of this filing, Herrera has not made any payment on the outstanding balances to Benchmark Services, despite numerous demands from ADs Checkout.

55. The outstanding balances have forced and continue to force ADs Checkout to alter its business strategy and has impacted ADs Checkout's ability to pursue new clients- resulting in a loss of business of at least $25,000.00.

56. Due to Defendants' conduct, ADs Checkout was forced to refund its customers in the aggregate amount of $23,864.00.

57. Furthermore, ADs Checkout refunded its customers in the aggregate amount of $23,864.00 due to Defendants' conduct.

58. ADs Checkout refunded its customers in the amount of $3,752.00 as ADs Checkout absorbed the cost of Herrera's guarantee that ADs Checkout and its customers would receive a 20.00% conversion of insurance leads to sales.

59. Additionally, as a result of the Defendants' conduct, ADs Checkout's owners have been forced to expend significant time, money, and energy on this matter, including spending $5,000.00 on attorneys' fees.

60. Finally, the Defendants' conduct and failure to make payments to Benchmark Services and X-Telecom has negatively affected ADs Checkout's reputation with its customers.

61. ADs Checkout has suffered at least $79,036.00 in damages and will continue to suffer damages as a result of all of the Defendants' conduct.

## COUNT I
## BREACH OF CONTRACT
**Plaintiff v. Lauro Vargas Herrera**

62. The preceding paragraphs are incorporated by reference, as if fully set forth at length herein.

63. An oral contract exists between ADs Checkout and Herrera wherein Herrera, on behalf of Herrera and X-Telecom, committed to repaying ADs Checkout $7,000.00 for a loan that ADs Checkout provided to Herrera to set up a call center in Colombia for X-Telecom.

64. Herrera further agreed to repay the $7,000.00 Loan before or by November 10, 2021. *See* Ex. C.

65. This agreement was also reached on November 10, 2021 during a phone conversation between Michael and Herrera.

66. Herrera breached the oral agreement by failing to repay the Loan to ADs Checkout by November 10, 2021 and using the Loan to fund X-Telecom's Medicare Insurance campaigns.

67. ADs Checkout performed all of its duties pursuant to the agreement.

68. As a result of Herrera's breach of the oral agreement, ADs Checkout suffered damages in excess of $7,000.00.

WHEREFORE, ADs Checkout demands judgment in its favor and against Herrera in an amount of $79,036.00 plus punitive damages, costs, interest, attorneys' fees and any such other relief this Courts deems equitable and just.

## COUNT II
## BREACH OF CONTRACT
### Plaintiff v. All Defendants

69. The preceding paragraphs are incorporated by reference, as if fully set forth at length herein.

70. As more fully set forth above, ADs Checkout has an express and/or implied agreement with Defendants for Defendants to provide ADs Checkout with insurance leads from X-Telecom and Benchmark Services.

71. Defendants expressly or impliedly promised that they would pay X-Telecom and Benchmark Services on behalf of ADs Checkout for insurance leads.

72. ADs Checkout justifiably relied on Defendants' representation that they would make payments to X-Telecom and Benchmark Services for the services that they provided.

73. ADs Checkout performed its part of the agreement as ADs Checkout made payments directly to Herrera for the insurance leads.

74. Despite ADs Checkout paying for the insurance leads, Defendants have failed to pay the outstanding balances on behalf of ADS Checkout without explanation or justification.

75. Defendants' failure to pay the outstanding balances resulted in ADs Checkout losing customers, lead volume, and has caused ADs Checkout to expend time, costs, and legal fees, which ADs Checkout is entitled to recover as consequential damages.

76. As a direct and proximate result of such breach, ADs Checkout has suffered and continues suffer damages as described herein.

WHEREFORE, ADs Checkout demands judgment in its favor and against Herrera in an amount of $79,036.00 plus punitive damages, costs, interest, attorneys' fees and any such other relief this Courts deems equitable and just.

## COUNT III
## UNJUST ENRICHMENT
## Plaintiff v. All Defendants

77. The preceding paragraphs are incorporated by reference, as if fully set forth at length herein.

78. ADs Checkout conferred benefits upon Defendants in the form of making prepayments to Defendants for the insurance lead services as set forth above.

79. Defendants appreciated these benefits by receiving prepayments from ADs Checkout and failing to use the funds to pay X-Telecom and Benchmark Services.

80. Defendants did not properly compensate ADs Checkout for its payments- instead seeking to enjoy the benefits of the payments that ADs Checkout made in exchange for insurance leads.

81. Defendants' retention of these benefits without payment of value to ADs Checkout is inequitable.

82. Defendants' conduct as set forth above was extreme, outrageous, to be regarded as atrocious, and utterly intolerable in a civilized community.

83. Defendants' conduct as set forth above was knowing, purposeful, willful, reckless and/or wonton, justifying punitive damages.

84. As set forth above, if ADs Checkout prevails at trial, it is entitled to recover its reasonable costs and attorneys' fees.

WHEREFORE, ADs Checkout demands judgment in its favor and against Herrera in an amount of $79,036.00 plus punitive damages, costs, interest, attorneys' fees and any such other relief this Courts deems equitable and just.

## COUNT IV
## CONVERSION
### Plaintiff v. All Defendants

85. The preceding paragraphs are incorporated by reference, as if fully set forth at length herein.

86. As set forth above, Defendants are in possession of funds belonging to ADs Checkout.

87. Such funds are valued in excess of $22,482.00.

88. Despite a demand that Defendants remit the funds to X-Telecom and Benchmark Services in exchange for insurance leads, Defendants have failed to return the funds to ADs Checkout.

89. By their conduct, Defendants deprived ADs Checkout of its right and possession of the funds.

90. Neither ADs Checkout nor Michael consented to Defendants' possession of the funds.

91. Defendants' conduct is inequitable and is without lawful justification.

92. As a result of Defendants' conduct, ADs Checkout has been harmed, has been deprived of lead volume and has lost several customers.

93. Defendants' conduct as alleged herein was knowing, intentional, and purposeful.

94. Defendants' conduct was extreme, outrageous, and intolerable in a civilized community, justifying the imposition of punitive damages.

95. Further, Defendants should be held jointly and severally liable for the harms set forth herein.

WHEREFORE, ADs Checkout demands judgment in its favor and against Herrera in an amount of $79,036.00 plus punitive damages, costs, interest, attorneys' fees and any such other relief this Courts deems equitable and just.

## COUNT V
### INJUNCTIVE RELIEF
**Plaintiff v. Lauro Vargas Herrera**

96. The preceding paragraphs are incorporated by reference, as if fully set forth at length herein.

97. As set forth above, Herrera discussed ADs Checkout's business on his Youtube channel and used ADs Checkout's name to promote leads to insurance agents and collect payment on behalf of ADs Checkout.

98. Further, Herrera represented himself as an agent and/or representative of ADs Checkout without ADs Checkout's consent and without lawful justification.

99. ADs Checkout believes and therefore avers that Herrera will continue to use ADs Checkout's name to promote leads to insurance agents and collect payments from ADs Checkout's customers.

WHEREFORE, ADs Checkout respectfully requests that the Court enter an Order directing that:

1) Herrera is enjoined from representing himself as an agent and/or representative of AD's Checkout; and

2) Herrera is enjoined from collecting payments from customers on behalf of ADs Checkout.

Respectfully Submitted,

**Rabinovich Sokolov Law Group LLC**

BY: _____
Oleg Sokolov, Esquire
*Attorney for Plaintiff Checkout LLC*

Dated:  February 1, 2022

## **VERIFICATION**

I, Michael Yakymiv, Member of Plaintiff Checkout LLC, in the above action, hereby verify that the statements made in the foregoing Complaint are true and correct to the best of my knowledge, information, and belief. I further understand that this statement is made subject to the penalties of 18 Pa. C.S. § 4904, relating to unsworn falsification to authorities.

_Michael Yakymiv_ (signature)
Michael Yakymiv

01/05/2022
Date

## CERTIFICATE OF SERVICE

I, Oleg Sokolov, Esquire, hereby certify that a true and correct copy of the enclosed *Complaint* was filed through this Court's ECF System.

Respectfully Submitted,

**Rabinovich Sokolov Law Group LLC**

BY: _____
Oleg Sokolov, Esquire
*Attorney for Plaintiff Checkout LLC*

Dated: February 1, 2022